UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------X

|  |  |  |
|---|---|---|
| SHAWN AHMED, | : | |
| | : | |
| Plaintiff, | : | 14 Civ. 7491 (KPF) |
| | : | |
| v. | : | **OPINION AND ORDER** |
| | : | |
| STEPHEN NATHANAEL PURCELL, | : | |
| | : | |
| Defendant. | : | |
| | : | |

----------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 14, 2016
```

KATHERINE POLK FAILLA, District Judge:

This case grew out of the troubled relationship between Plaintiff Shawn

Ahmed and Defendant Stephen Purcell, a relationship that began online in July

2011, involved a single month of in-person contact, and ended shortly

thereafter.  On September 16, 2014, Plaintiff filed the instant action, seeking a

declaration that his conduct toward Defendant was not tortious, as well as

monetary relief for Defendant's conduct toward him.  On June 30, 2015,

Defendant filed a motion to dismiss one cause of action for failure to state a

claim on which relief could be granted and to dismiss the remaining causes of

action for lack of personal jurisdiction.  Defendant also filed a motion to

dismiss the entire case for improper venue or, in the alternative, to transfer the

case to the United States District Court for the District of Arizona.  For the

reasons set forth in the remainder of this Opinion, Defendant's motions to

dismiss for failure to state a claim and lack of personal jurisdiction are

granted.  As a result, there is no need for the Court to consider whether venue lies in the Southern District of New York.

### BACKGROUND[1]

#### A.    Factual Background

##### 1.    Plaintiff's Relationship with Defendant

###### a.    The New York Component of the Relationship

In July 2011, Plaintiff connected with Defendant on a dating website. (Am. Compl. ¶ 18).  At the time, Plaintiff was a resident of Canada, and Defendant was living in New Jersey.  (*See id.* at ¶¶ 8, 59; Def. Aff. at 1). Nevertheless, the two began to correspond online.  (Am. Compl. ¶ 18).

In September 2011, Plaintiff traveled to New York City to attend a summit for the United Nations Foundation.  (Am. Compl. ¶ 23). While in New York, Plaintiff met Defendant in person, and "for approximately one month, … [Defendant] spent nearly every night with [Plaintiff,] first at [Plaintiff's] hotel in Manhattan and later in an apartment that [Plaintiff's] friend had rented for

---

[1]    The facts contained in this Opinion are drawn from the Amended Complaint ("Am. Compl.") (Dkt. #32), and are taken as true for purposes of the pending motion.  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (when reviewing a complaint for failure to state a claim, the court will "assume all well-pleaded factual allegations to be true" (internal quotation marks omitted)).  Furthermore, "because a motion to dismiss for lack of personal jurisdiction requires the resolution of factual issues outside the pleadings, the Court considers other relevant submissions from the parties at this stage."  *Elsevier, Inc.* v. *Grossman*, 77 F. Supp. 3d 331, 338 n.1 (S.D.N.Y. 2015) (internal quotation marks and citation omitted); *accord Dorchester Fin. Sec., Inc.* v. *Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013) (per curiam) ("[W]e have made clear that a district court may [consider materials outside the pleadings] without converting a motion to dismiss for lack of personal jurisdiction into a motion for summary judgment."). Specifically, the Court will consider Plaintiff's Affidavit ("Pl. Aff.") (Dkt. # 53) and Defendant's Affidavit ("Def. Aff.") (Dkt. #46, Ex. 1).  For convenience, the Court will refer to Defendant's opening brief on the motions to dismiss for failure to state a claim and lack of personal jurisdiction as "Def. Br." (Dkt. #44); Plaintiff's opposition brief to those motions as "Pl. Opp." (Dkt. #52); and Defendant's reply brief as "Def. Reply" (Dkt. #59).

him." (*Id.* at ¶ 24).  Plaintiff alleges that, during their time together, Defendant "physically attacked [him] on no less than three separate occasions." (*Id.* at ¶ 26).

First, Plaintiff alleges that, while he and Defendant were "walking on a public sidewalk on Eastern Parkway in Brooklyn, [Defendant] struck [Plaintiff] on the back of the head" because Plaintiff had "made a comment or joke that [Defendant] did not approve of." (Am. Compl. ¶ 27).  Plaintiff alleged that "[t]he strike was both sudden and forceful enough that it took [him] by surprise and both shocked and scared him." (*Id.*).

Second, Plaintiff alleges that Defendant hit him while the two were in a restaurant.  (Am. Compl. ¶ 29).  Plaintiff explains that Defendant was "angered" by Plaintiff's suggestion that "'parfaits' are merely a fancy term for 'ice cream,'" so he "struck [Plaintiff] on top of the head using his hand." (*Id.*).  Defendant allegedly hit Plaintiff with enough force to cause a "lingering headache," and Plaintiff says he "felt crippled by the sheer humiliation [that] he was being physically attacked in a restaurant." (*Id.*).

Finally, Plaintiff states that Defendant struck him with a closed fist "[a]t a residential location on Lefferts Avenue in Brooklyn." (Am. Compl. ¶ 30).  Plaintiff also alleges, "[u]pon information and belief," that Defendant recounted some version of this incident "to a third party[,] saying[:] 'I'm ashamed to admit that during the relationship I lost my temper and hit [Plaintiff] with a pillow harder than I had intended to.'" (*Id.* at ¶ 31).

### b.    The Long-Distance Component of the Relationship

Plaintiff left New York City on October 8, 2011.  (Am. Compl. ¶ 33).

Nevertheless, Plaintiff and Defendant remained in contact, in varying degrees of

intensity, between 2011 and 2013.  (*Id.* at ¶ 37).  During this time, Plaintiff

alleges that Defendant "criticize[d] [him] as too feminine and overweight."  (*Id.*).

According to Plaintiff, "[t]hese routine accusations and criticisms constituted a

dangerous pattern that [led] to [Plaintiff's] routine starvation of himself."  (*Id.* at

¶ 38).

In addition, Plaintiff alleges that Defendant threatened to "expose

[Plaintiff's] homosexuality" to Plaintiff's conservative family.  (Am. Compl.

¶¶ 54-57).  Similarly, Plaintiff claims that Defendant "threatened to out

[Plaintiff] as gay to [a] circle of friends [Plaintiff] made through YouTube."  (*Id.*

at ¶ 62).  Plaintiff claims that these threats to out him were particularly serious

because Plaintiff frequently travels to countries where it would be dangerous

for him to reveal his sexual orientation.  (*Id.* at ¶¶ 13, 57-61).

Plaintiff claims that "he did not want to reveal his sexual orientation,"

but he "believed it was more important that he share his experiences of abuse

with others in the gay community ... who [might] feel even more alone than

[Plaintiff[."  (Am. Compl. ¶ 68).  As a result, "[i]n December 2012, [Plaintiff]

made a public video recorded statement regarding his sexual orientation and

the circumstances that led him to his forced disclosure of his homosexuality."

(*Id.* at ¶ 70).

4

### 2.     Defendant's Alleged Statements Regarding Minors

Plaintiff alleges that, over the course of his relationship with Defendant, Defendant admitted to watching child pornography.  (Am. Compl. ¶¶ 21, 41, 80-81).  In addition "[Defendant] admitted that when he was 19 years old he had sexual relations with at least one minor."  (*Id.* at ¶ 21).  According to Plaintiff, "[Defendant] threatened that if [Plaintiff] exposed [Defendant] as a sexual deviant, [Defendant] would destroy the reputation [Plaintiff] took so long to build."  (*Id.* at ¶ 97).

At some point, Plaintiff learned that Defendant was interested in a job with a Japanese television company called NTVIC.  (Am. Compl. ¶ 104).  This company "produces, among other things, content for minors."  (*Id.* at ¶ 105).  "Believing that [Defendant] posed a real threat to any minor working with or near NTVIC, [Plaintiff] wrote a letter to the … company regarding [Defendant's] history with child pornography and relationship with at least one minor as an adult."  (*Id.* at ¶ 106).  NTVIC allegedly "thanked [Plaintiff] for the information and confirmed that [Defendant] was never an employee."  (*Id.* at ¶ 107).

Plaintiff also began "blogging about [Defendant's] sexual proclivities," though he insists that his blog posts did not mention Defendant by name.  (Am. Compl. ¶ 103).  Plaintiff claims that his blogging was "a way of coping with the stress of recalling and reporting such disturbing and distressing conversations with [Defendant]."  (*Id.*).

### 3.    Defendant's Cease and Desist Letter

On July 25, 2014, Defendant sent Plaintiff a cease and desist letter. (Am. Compl., Ex. B at 1).  This letter "demand[ed]" that Plaintiff: (i) "stop writing or e-mailing defamatory and privacy-invading statements about [Defendant] in print or via the Internet"; (ii) "permanently delete all of the defamatory and privacy-invading material [he had] published about [Defendant] on the World Wide Web"; and (iii) "contact every website [Plaintiff] kn[e]w of that mirrored or copied any of [his] publications about [Defendant] and order them to delete them." (*Id.*).  The letter stated that, if Plaintiff did not comply with these demands by Friday, August 8, 2014, Defendant would sue him "in the United States District Court for the District of Arizona." (*Id.* at 2).  "At a minimum," the letter continued, the suit filed against Plaintiff would seek "$700,000 in damages" for: "[i] defamation; [ii] invasion of privacy; [iii] intentional infliction of emotion[al] distress; and [iv] intentional interference with business relations." (*Id.*).  At the back of the demand letter, Defendant included a draft of a civil complaint raising these four causes of action.

### B.    Procedural Background

On September 14, 2014, Plaintiff filed the Complaint in this case, seeking various forms of relief.  (Dkt. #1).  On April 17, 2015, Plaintiff filed the Amended Complaint, seeking a declaratory judgment that Defendant did not have an actionable claim for (i) defamation under Arizona or New York law; (ii) public disclosure of private facts or invasion of privacy under Arizona law; (iii) intentional infliction of emotional distress under Arizona or New York law;

and (iv) tortious interference with business relations under Arizona or New York law.  (Am. Compl. ¶¶ 116-38).  Plaintiff also brought a cause of action for intentional infliction of emotional distress under New York law.  (*Id.* at ¶¶ 139-45).

On June 30, 2015, Defendant filed motions to dismiss Plaintiff's case, arguing that: (i) the Amended Complaint fails to state a claim for intentional infliction of emotional distress; (ii) this Court lacks personal jurisdiction over the Defendant for Plaintiff's remaining claims; and (iii) venue is improper in the Southern District of New York.  (Dkt. #44-45).

## DISCUSSION

### A.    Applicable Law

#### 1.    Motions to Dismiss for Failure to State a Claim

When a court considers a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), it must "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  A plaintiff will survive a motion to dismiss if he alleges "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 569 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does

7

require enough facts to nudge [a plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)).

The Court is not, however, bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Hennenman*, 517 F.3d 140, 149 (2d Cir. 2008) (citation omitted); *accord Biro* v. *Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015); *see also Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (internal quotation marks omitted)).

### 2.    Motions to Dismiss for Lack of Personal Jurisdiction

When a defendant brings a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano* v. *Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (citation omitted); *accord In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). "Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Dorchester Fin. Sec., Inc.* v. *Banco BRJ, S.A.*, 722 F.3d 81, 84-85 (2d Cir. 2013) (per curiam) (citation omitted); *accord In re Terrorist Attacks*, 714 F.3d at 673 ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a *prima facie* showing that

jurisdiction exists." (citation omitted)).  All jurisdictional allegations "are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor[.]"  *A.I. Trade Fin., Inc.* v. *Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993).  However, the court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation."  *In re Terrorist Attacks*, 714 F.3d at 673 (citations omitted); *accord Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).

District courts deciding a motion to dismiss for lack of personal jurisdiction must engage in a two-part analysis.  First, the court must determine whether there is "a statutory basis for exercising personal jurisdiction."  *Marvel Characters, Inc.* v. *Kirby*, 726 F.3d 119, 128 (2d Cir. 2013).  When a court makes this determination, it "applies the forum state's personal jurisdiction rules" unless a federal statute "specifically provide[s] for national service of process."  *PDK Labs, Inc.* v. *Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) (internal quotation marks omitted).  Second, if there is a statutory basis for personal jurisdiction, the court must decide whether the exercise of jurisdiction comports with due process.  *Sonera Holding B.V.* v. *Çukurova Holding A.Ş.*, 750 F.3d 221, 224 (2d Cir.) (per curiam), *cert. denied*, 134 S. Ct. 2888 (2014).

**B.      Analysis**

**1.      Plaintiff Has Failed to State a Claim for Intentional Infliction of Emotional Distress Under New York Law**

"It is well established under New York law that a claim of intentional infliction of emotional distress has a one-year statute of limitations." *Forbes* v. *Merrill Lynch, Fenner & Smith, Inc.,* 957 F. Supp. 450, 455 (S.D.N.Y. 1997); *see also Ross* v. *Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 491 (2007). Thus, when a court assesses such a claim, it can only consider the defendant's behavior in the year before the claim was filed. *See Mariani* v. *Consol. Edison Co. of New York*, 982 F. Supp. 267, 273 (S.D.N.Y. 1997), *aff'd sub nom. Mariani* v. *Consol. Edison Co.*, 172 F.3d 38 (2d Cir. 1998). There is only one exception to this rule:  If the defendant engaged in a course of conduct that began outside the one-year limitations period, but ended *within* the limitations period, the court may consider the defendant's entire course of conduct. *See id.* at 273-74 (citing *Santan-Morris* v. *N.Y. Univ. Med. Ctr.*, No. 96 Civ. 621 (MGC), 1996 WL 709577, at *4 (S.D.N.Y. Dec. 10, 1996); *Drury* v. *Tucker,* 621 N.Y.S.2d 822, 823 (4th Dep't 1994)). For this exception to apply, however, the defendant's actions during the year before the plaintiff brought suit "must be sufficient to make out a claim for intentional infliction of emotional distress, independent of those acts that are part of the offending course of conduct but fall outside the time bar." *Id.* (internal quotation marks omitted).

Here, Plaintiff filed his claim on September 16, 2014. (Dkt. #1). As a result, this Court must determine whether Defendant's alleged actions after September 16, 2013, are "sufficient to make out a claim for intentional

10

infliction of emotional distress." *Mariani*, 982 F. Supp. at 273.  Here, Plaintiff only makes one allegation regarding tortious conduct that took place after September 16, 2013.  Specifically, Plaintiff alleges that Defendant sent him a cease and desist letter, threatening to sue him if he did not delete some of his internet posts.  (Am. Compl. ¶ 108 & Ex. B; *see also* Pl. Opp. 18 (specifying cease and desist letter as act falling within the limitations period)).  But this letter simply cannot support a claim for intentional infliction of emotional distress.

In order to state a claim for intentional infliction of emotional distress under New York law, a plaintiff must show that the defendant, "by extreme and outrageous conduct[,] intentionally or recklessly cause[d] severe emotional distress." *Murphy* v. *Am. Home Products Corp.*, 58 N.Y.2d 293, 303 (1983) (quoting RESTATEMENT (SECOND) OF TORTS § 46); *see also Howell* v. *N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993).  Conduct only qualifies as "extreme and outrageous" if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Murphy,* 58 N.Y.2d at 303 (quoting RESTATEMENT (SECOND) OF TORTS § 46, cmt. d); *accord Howell*, 81 N.Y.2d at 122; *Marmelstein* v. *Kehillat New Hempstead*, 11 N.Y.3d 15, 22-23 (2008).

Applying these principles to the allegations in the Amended Complaint, the Court concludes that Defendant's cease and desist letter was not so atrocious as to be "utterly intolerable in a civilized community."  *Murphy,* 58 N.Y.2d at 303 (quoting RESTATEMENT (SECOND) OF TORTS § 46, cmt. d).  The cease

11

and desist letter was calm and direct: it set out the elements for defamation, invasion of privacy, intentional infliction of emotional distress, and intentional interference with business relations, and then explained why — from Defendant's perspective — Plaintiff's conduct satisfied these elements.  (Am. Compl., Ex. B).  The letter also informed Plaintiff that he could contact Defendant's attorney if he had any questions.  (*Id.*).  Thus, Defendant's letter cannot be considered extreme and outrageous.

Plaintiff insists that Defendant's letter was extreme and outrageous because it demanded that Plaintiff:

> remove Internet posts that Plaintiff had no power to remove because they were written and/or posted by third parties on third party websites.  As such, Plaintiff reasonably interpreted the cease and desist letter as a demand that he pay $700,000, since compliance with Defendant's ultimatum of removing certain posts from the Internet was impossible to accomplish.

(Pl. Opp. 16-17).  In point of fact, the cease and desist letter never asked Plaintiff to remove material that was posted online by "third parties"; rather, the letter asked Plaintiff to "*contact*" third parties and "order" them to remove certain posts.  (Am. Compl., Ex. B at 1 (emphasis added)).  Defendant never suggested that he would sue Plaintiff if the third parties failed to comply with Plaintiff's orders.  (*Id.*).  Similarly, although this is a finer point, the cease and desist letter did not request, much less demand, any money from Plaintiff, and it certainly cannot be seen as the functional equivalent of an extortion attempt; it simply asked Plaintiff to change his behavior.  (*Id.*).

12

Plaintiff also contends that the cease and desist letter was extreme and outrageous because it reiterated an earlier threat "to destroy Plaintiff's reputation" so that Plaintiff would have a "hard time" continuing his work. (Pl. Opp. 16). However, such a threat cannot be considered outrageous. *See, e.g., Novak* v. *Rubin,* 514 N.Y.S.2d 523, 524 (2d Dep't 1987) (threat to ruin plaintiff's wife's career was, "as a matter of law, simply not 'outrageous' enough to support ... a claim [for intentional infliction of emotional distress]"); *Yong Ki Hong* v. *KBS Am., Inc.*, 951 F. Supp. 2d 402, 426 (E.D.N.Y. 2013) (threat that it would be "'very difficult' for [the plaintiff's] business to survive … [did] not rise to the level of patent outrageousness").

Finally, Plaintiff insists that the cease and desist letter was outrageous because it threatened to bring a frivolous lawsuit. (Pl. Opp. 17). For starters, while the Court must accept the well-pleaded allegations in the Complaint, it need not accept Plaintiff's characterization of any lawsuit contemplated by Defendant as "frivolous." In any event, while threatening to bring even a frivolous lawsuit is certainly ill-advised, this Court cannot conclude that it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Murphy,* 58 N.Y.2d at 303 (quoting RESTATEMENT (SECOND) OF TORTS § 46, cmt. d).

Accordingly, because the Amended Complaint does not allege that Defendant engaged in outrageous conduct after September 16, 2013, Plaintiff

has not stated a claim for intentional infliction of emotional distress under New York law.  *See Mariani*, 982 F. Supp. at 273-74.[2]

### 2.  Plaintiff Has Not Made a *Prima Facie* Showing That the Court Has Personal Jurisdiction Over Defendant

In order to defeat a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a *prima facie* showing that: (i) a New York statute allows the defendant to be haled into court, *see Marvel Characters, Inc.*, 726 F.3d at 128; and (ii) exercising personal jurisdiction over the defendant is consistent with due process, *see Sonera Holding B.V.*, 750 F.3d at 224.  Plaintiff has not demonstrated that there is a statutory basis for exercising personal jurisdiction with respect to his first three causes of action, and has made only a marginal showing as to the fourth.  Even as to that cause of action, Plaintiff has not demonstrated that exercising personal jurisdiction would be consistent with due process.  As a result, Plaintiff's case must be dismissed.

---

[2]    Plaintiff's response to Defendant's motion to dismiss includes two exhibits that provide background information about intimate partner violence in various communities.  (Pl. Br., Ex. A-B).  Defendant filed a motion to strike these exhibits (Dkt. #63), arguing that they could not be considered in connection with a motion to dismiss under Rule 12(b)(6) because they did not qualify as "sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss."  (Dkt. #65 at 1 (quoting *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).  The Court agrees with Defendant, and will therefore strike the exhibits.  *See In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013) ("In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies.").

In addition, the Court notes that, in connection with Defendant's motion to strike, the parties have agreed that Plaintiff's affidavit should not be considered as the Court resolves the Rule 12(b)(6) motion.  (*See* Dkt. #67-68).  Consequently, the Court will only consider that affidavit as it analyzes the motion to dismiss under Rule 12(b)(2).

### a.    The Statutory Basis for Personal Jurisdiction

Plaintiff contends that New York Civil Practice Law and Rules Section 302(a)(1), provides a statutory basis for this Court to exercise personal jurisdiction over Defendant.  Under that section, a court may exercise personal jurisdiction over a defendant who "transacts any business within the state or contracts anywhere to supply goods or services in the state," so long as the claims against the defendant "aris[e] from" his business or his contract.  N.Y. C.P.L.R. § 302(a)(1).  Here, Plaintiff contends that Defendant "transact[ed] … business" in New York in four separate ways.  The Court will consider each of these contentions in turn.

### i.    Defendant's Interactions with NTVIC

The Court largely agrees with Plaintiff's argument that, when all of the jurisdictional allegations and affidavits are construed in Plaintiff's favor, they suggest that Defendant "transact[ed] … business" in New York with a company called NTVIC.  (Pl. Opp. 20).  A defendant "transacts … business" within New York whenever he "purposely avail[s] [himself] of the privilege of conducting activities within New York and thereby invoke[s] the benefits and protections of its laws[.]"  *Bank Brussels Lambert* v. *Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 787 (2d Cir. 1999) (quoting *Parke-Bernet Galleries, Inc.* v. *Franklyn*, 26 N.Y.2d 13, 18 (1970)).  Whether a defendant has purposely availed himself of state law depends on the "totality of the circumstances."  *Agency Rent A Car Sys., Inc.* v. *Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996).

Here, the relevant allegations and affidavits suggest that Defendant purposely availed himself of New York law as he interacted with NTVIC. Defendant's cease and desist letter — attached to the Complaint as Exhibit B — suggests that Defendant applied for a job at NTVIC, "the New York-based subsidiary of … a Japanese TV and news station[]." (Am. Compl., Ex. B at 7). In other words, Defendant solicited business from a New York-based company. *See Bank Brussels Lambert*, 171 F.3d at 787 (suggesting that jurisdiction under N.Y. C.P.L.R. § 302(a)(1) could be "premised on solicitations" of business in New York); *cf. V Cars, LLC* v. *Israel Corp.*, 902 F. Supp. 2d 349, 364 (S.D.N.Y. 2012) (finding that a defendant had not purposely availed itself of state law, in part because the defendant had not "solicit[ed] business in New York"). Defendant also admits that he ultimately received an offer to work for NTVIC. (*Id.*). *Cf. V Cars, LLC*, 902 F. Supp. 2d at 362 (explaining that "unproductive" solicitations and meetings are "insufficient to establish [the] requisite contacts with the state"). By Defendant's own estimation, this offer created a legally protected "business relation[ship]" between NTVIC and himself. (*Id.*). Thus, under the totality of the circumstances, the Court concludes that Defendant purposely — if briefly — availed himself of the benefits of New York law.[3]

---

[3]      Plaintiff does not discuss the possibility that Defendant contracted "to supply … services" to NTVIC in New York. N.Y. C.P.L.R. § 302(a)(1). However, when the jurisdictional allegations and affidavits are construed in the light most favorable to Plaintiff, they suggest that Defendant had such a contract, albeit one of the briefest duration. Notably, the cease and desist letter attached to the Amended Complaint refers to NTVIC as Defendant's "employer." (Am. Compl., Ex. B at 6). In addition, Plaintiff's affidavit suggests that Defendant planned to move to New York to fulfill his job responsibilities for NTVIC. (Pl. Aff. at 2). According to this affidavit, Defendant left a

As a result, the Court must determine whether any of Plaintiff's claims "aris[es] from" Defendant's transactions with NTVIC.  N.Y. C.P.L.R. § 302(a)(1). As the Second Circuit has explained:

> [A] claim "aris[es] from" a particular transaction when there is "some articulable nexus between the business transacted and the cause of action sued upon," [*McGowan* v. *Smith*, 52 N.Y.2d 268, 272 (1981)], or when "there is a substantial relationship between the transaction and the claim asserted," *Kreutter* v. *McFadden Oil Corp.,* 71 N.Y.2d 460, 467[] (1988). A connection that is "merely coincidental" is insufficient to support jurisdiction. *Johnson* v. *Ward,* 4 N.Y.3d 516, 520[] (2005). This inquiry is a fact-specific one, and when the connection between the parties' activities in New York and the claim crosses the line from "substantially related" to "mere coincidence" is not always self-evident.

*Sole Resort, S.A. de C.V.* v. *Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006); *see also Best Van Lines, Inc.* v. *Walker*, 490 F.3d 239, 249 (2d Cir. 2007).

In this case, there is an "articulable nexus" between Plaintiff's fourth claim for declaratory relief and Defendant's transactions with NTVIC.  In his fourth claim, Plaintiff seeks a declaration that he is not liable for tortiously interfering with Defendant's business.  (Am. Compl. ¶¶ 134-38).  Notably, the body of the Amended Complaint contains only one statement regarding contact

---

comment on a friend's Facebook page, stating that he was moving to New York.  (*Id.*). Conversely, however, Plaintiff makes clear in the Amended Complaint that NTVIC confirmed to Plaintiff that Defendant "was never an employee."  (Am. Compl. ¶ 107).  A reasonable factfinder could infer from all of these facts that: (i) Defendant had a valid, at-will employment contract to perform work in New York; but (ii) NTVIC terminated this contract before Defendant had an opportunity to move to New York and begin his work. *Cf. Peters* v. *MCI Telecomm. Corp.*, 685 F. Supp. 411, 414 (S.D.N.Y. 1988) (noting that a valid "employment contract" had been formed, even though the contract was an "at-will agreement" and was terminated before the plaintiff began working).

between Plaintiff and any of Defendant's business associates: namely, that Plaintiff sent a letter to NTVIC, warning the company about Defendant's alleged "history with child pornography and sexual relationship with at least one minor as an adult." (*Id.* at ¶ 106).  Thus, the Court will construe Plaintiff's fourth claim as a request for a declaration that Plaintiff is not liable for tortious interference with the relationship between Defendant and NTVIC.  Because Plaintiff is seeking a declaration that he is not liable for disrupting the business that tied Defendant to New York, the Court concludes that Plaintiff's fourth claim "aris[es] from" Defendant's in-state transactions.  N.Y. C.P.L.R. § 302(a)(1).[4]  As a result, Section 302(a)(1) provides a statutory basis for this Court to exercise personal jurisdiction over Defendant for Plaintiff's fourth claim.

By contrast, there is no "articulable nexus" or "substantial relationship" between Plaintiff's other claims for declaratory relief and Defendant's transactions with NTVIC.  Plaintiff's first three claims seek declarations that: (i) Plaintiff is not liable for defamation; (ii) Plaintiff is not liable for invasion of privacy; and (iii) Plaintiff is not liable for intentional infliction of emotional distress.  Each of these three claims concerns an injury to Defendant's reputation or feelings, rather than an injury to Defendant's business relationship with NTVIC.  Consequently, the Court cannot say that Plaintiff's first three claims "aris[e] from" Defendant's contacts with New York.

---

[4]     Similarly, to the extent Plaintiff's fourth claim is seeking a declaration that Plaintiff is not liable for interfering with Defendant's contract to provide services to NTVIC in New York, Plaintiff's claim "aris[es] from" that contract.  N.Y. C.P.L.R. § 302(a)(1).

### ii.    Defendant's Travel to New York in 2014

Plaintiff also points to Defendant's statements that he had traveled to New York in 2014 to support his contention that there is a statutory basis for personal jurisdiction.  (Pl. Opp. 20).  Presumably, Plaintiff wishes the Court to infer that Defendant's travel to New York amounted to a business transaction under Section 302(a)(1).  However, traveling to New York, without more, is insufficient to establish personal liability under Section 302(a)(1).  *See, e.g.,* *Eastboro Found. Charitable Trust* v. *Penzer*, 950 F. Supp. 2d 648, 660 (S.D.N.Y. 2013); *PaineWebber Inc.* v. *Westgate Grp., Inc.*, 748 F. Supp. 115, 120 (S.D.N.Y. 1990).  Furthermore, even if Defendant's 2014 travel to New York *did* constitute a business transaction, Plaintiff has not explained how any of his four claims for declaratory relief might be related to that transaction.  As a result, the Court cannot conclude that any of Plaintiff's claims "ar[ose] from" Defendant's 2014 travel.  N.Y. C.P.L.R. § 302(a)(1).

### iii.   Defendant's Preparations to Move to New York in 2014

Plaintiff also ascribes significance to Defendant's statements that he was moving to New York, as well as Defendant's decision to join a Facebook group for individuals who "have a need for housing" in New York City.  (Pl. Opp. 20-21).  The Court does not believe that Defendant's plans to move to New York, or his decision to seek housing in New York, constitutes a business transaction under Section 302(a)(1).  *See V Cars, LLC*, 902 F. Supp. 2d at 362 (explaining that "exploratory" meetings are insufficient to establish that a defendant

19

transacted business in New York).  However, even if Defendant explored and moved to New York in 2014, and even if the Court could consider the exploration or the move to be a business transaction, Plaintiff has not made any attempt to explain how the exploration or the move might be related to the claims he advances in this litigation.  In other words, Plaintiff has not shown that any of the claims made in this case "aris[es] from" Defendant's alleged relocation to New York.  N.Y. C.P.L.R. § 302(a)(1).

### iv.    Defendant's Film Screening in New York in 2014

Finally, Plaintiff notes that "Defendant was a producer on a film that fundraised in New York City and screened in New York City in 2014." (Pl. Opp. 22).  Here, too, Plaintiff has failed to explain how the film has any connection to the claims in this case.  Thus, Plaintiff has not made a *prima facie* showing that there is a statutory basis for this Court to exercise personal jurisdiction over Defendant as to Plaintiff's first three claims for declaratory relief.

### b.    The Constitutional Basis for Personal Jurisdiction

As the preceding analysis underscores, whether Defendant's contacts with NTVIC were sufficient to trigger a statutory basis for personal jurisdiction is a very close question, and a strong argument can be made that Defendant's ultimately abortive job search is analytically closer to the "exploratory" efforts that have been found to be insufficient to warrant the exercise of personal jurisdiction.  The Court has concluded that a statutory basis exists for it to exercise personal jurisdiction over Plaintiff's fourth claim for declaratory

20

relief — in part because the relevant materials are to be construed in Plaintiff's favor, and in part because these same materials make clear that the Court cannot exercise personal jurisdiction over Defendant without offending due process.

"To establish personal jurisdiction over a defendant, due process requires a plaintiff to allege [i] that a defendant has certain minimum contacts with the relevant forum, and [ii] that the exercise of jurisdiction is reasonable [under] the circumstances." *Eades* v. *Kennedy, PC Law Offices*, 799 F.3d 161, 168-69 (2d Cir. 2015) (quoting *In re Terrorist Attacks,* 714 F.3d at 673 (internal quotation marks omitted)); *see also Int'l Shoe Co.* v. *Washington,* 326 U.S. 310, 316 (1945)).  A defendant's contacts with the forum state can satisfy the "minimum contacts" requirement if they show that the defendant "purposefully availed [himself] of the privilege of doing business in the forum," such that the defendant "could foresee being haled into court there," and the plaintiff's claims arose out of that business.  *Eades*, 799 F.3d at 169; *see also Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 474-75 (1985)).

As noted, when all the relevant allegations and affidavits are construed in the light most favorable to Plaintiff, they suggest that Defendant purposely availed himself of New York law by soliciting and accepting an offer of employment from NTVIC.  (*See supra* at 15-16 & n.3).  In addition, the Court believes that Plaintiff's fourth claim for declaratory relief arises out of Defendant's contacts with this state.  Thus, Defendant had the requisite

minimum contacts with New York, and the Court must consider whether the exercise of jurisdiction would be reasonable.  *See Eades*, 799 F.3d at 168-69.

When a defendant has the requisite minimum contacts with the forum state, he must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  *Licci*, 732 F.3d 161, 173 (quoting *Burger King,* 471 U.S. at 477).  When courts assess whether the exercise of jurisdiction would be reasonable, they consider:

> [i] the burden that the exercise of jurisdiction will impose on the defendant; [ii] the interests of the forum state in adjudicating the case; [iii] the plaintiff's interest in obtaining convenient and effective relief; [iv] the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and [v] the shared interest of the states in furthering substantive social policies.

*Chloe* v. *Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010).  As the Court considers each of these factors, it will be guided by the Supreme Court's admonition that the reasonableness inquiry ultimately turns on whether the exercise of personal jurisdiction "would comport with fair play and substantial justice."  *Burger King,* 471 U.S. at 476; *see also Licci,* 732 F.3d at 170.

The Second Circuit has stated that a defendant can "rare[ly]" show that the exercise of personal jurisdiction to be unreasonable if he has sufficient minimum contacts with the forum state.  *Eades*, 799 F.3d at 168 (quoting *Licci,* 732 F.3d at 170).  However, it is not impossible for a defendant to make this showing, especially in a case where the defendant's contacts with the forum

state are weak.  *See Metro. Life Ins. Co.* v. *Robertson-Ceco Corp.*, 84 F.3d 560,
575 (2d Cir. 1996) (holding that a defendant had sufficient minimum contacts
with the forum state, but that exercise of personal jurisdiction would be
unreasonable: "The present case is not one in which subjecting Robertson to
jurisdiction in Vermont would merely be inconvenient; Met Life's interest in
pursuing its action in Vermont and Vermont's interest in adjudicating the case
are so attenuated, if not nonexistent, that the exercise of personal jurisdiction
would violate our basic sense of 'fair play and substantial justice' — and
deprive the defendants of the due process guaranteed by the Constitution.").

The slender margin by which Plaintiff has shown the requisite minimum
contacts informs the Court's reasonableness analysis.  While the Court can
infer that Defendant availed himself of the benefits of New York law by entering
into a contractual agreement to work for NTVIC, that agreement was fleeting,
and it is undisputed that the agreement was repudiated before either party
began performing any contractual obligations.  (*See* Am. Compl. ¶ 107
(conceding that NTVIC "confirmed that [Defendant] was never an employee")).
Thus, the Court must be particularly careful to ensure that the exercise of
personal jurisdiction would be reasonable.  *See Metro. Life Ins. Co.*, 84 F.3d at
568  ("[D]epending upon the strength of the defendant's contacts with the
forum state, the reasonableness component of the constitutional test may have
a greater or lesser effect on the outcome of the due process inquiry.").  After a
careful examination of the relevant factors, the Court concludes that it cannot

23

exercise personal jurisdiction over Defendant for Plaintiff's fourth claim for declaratory relief.

### i.    The Burden on Defendant

Defendant argues that litigation in this state will be burdensome for him because he lives in Arizona, his attorney is based in Arizona, and he would like to call Arizona witnesses at trial.  Ordinarily, the Court would give this factor very little weight because the Court can take steps to mitigate these burdens, such as holding telephonic conferences or accepting electronic documents.  *See Bank Brussels Lambert*, 305 F.3d at 129-30; *Metro. Life Ins. Co.*, 84 F.3d at 574 (noting that the burden of an out-of-state defendant weighed slightly against the exercise of personal jurisdiction).  However, in order to ensure that notions of "fair play" are respected, *Burger King,* 471 U.S. at 476, the Court is inclined to place additional emphasis on the burden to an out-of-state defendant where, as here, the plaintiff's conduct severed the defendant's connection to the forum state.  In other words, because Plaintiff's intentional conduct ended the inchoate business relationship that was Defendant's only jurisdictionally-significant tie to New York, the Court is willing to place some extra weight on the burdens that Defendant will face if he is forced to litigate this case from afar.

### ii.    The Forum State's Interest

New York has a very weak interest in adjudicating Plaintiff's fourth claim for declaratory relief.  Neither party to this action is a citizen of New York.  *See Metro. Life Ins. Co.*, 84 F.3d at 574 (suggesting that Vermont had a weak

interest in adjudicating a particular dispute, in part because the injured party was not a Vermont citizen).  Furthermore, while New York may have an interest in ensuring that business relationships formed under the laws of New York are not disturbed, this interest is "adequately protected" by laws that allow the parties to these relationships to sue in New York courts.  *Id.*  In this case, neither party involved in the relevant business relationship wishes to utilize a New York forum to protect is rights.  In fact, the only individual who wishes to litigate in New York is Plaintiff, who was not affected by Defendant's relationship with NTVIC or by the dissolution of that relationship.  As a result, New York has a very weak interest in adjudicating Plaintiff's fourth claim for declaratory relief.[5]  This factor "weighs heavily against the reasonableness of the court's exercise of [personal] jurisdiction."  *Id.*

### iii.    Plaintiff's Interest

Plaintiff argues that exercising personal jurisdiction over Defendant will help him obtain more convenient and effective relief than he could obtain in an alternative forum.  In that regard, Plaintiff contends that it would be more convenient for him to litigate any issues surrounding Defendant's relationship with NTVIC in this forum than it would be to litigate in Arizona.  (Pl. Opp. 25).  Plaintiff also emphasizes that he wishes to call witnesses who are located here

---

[5]     Whatever the merits of Plaintiff's claim that New York has an interest in protecting the speech of individuals discussing events that took place in New York (*see* Pl. Opp. 25), that argument is inapposite here.  Plaintiff has not alleged that he told NTVIC anything about Defendant's allegedly abusive conduct in New York; rather, he has only alleged that that he told NTVIC about Defendant's alleged "history with child pornography and sexual relationship with at least one minor as an adult."  (Am. Compl. ¶ 106).

and it is easier to travel from Toronto (where he lives) to New York than to travel from Toronto to Arizona.  (*Id.*).  However, Plaintiff, like Defendant, must recognize that the burdens of travel to an alternative forum can be minimized through the use of modern technology.  *See Bank Brussels Lambert*, 305 F.3d at 129-30.  As a result, this factor tips only slightly in favor of the exercise of personal jurisdiction.

### iv.     The Interest of the Interstate Judicial System

The exercise of personal jurisdiction with respect to Plaintiff's fourth claim for declaratory relief would disserve the interstate judicial system's interest in "obtaining the most efficient resolution" of the controversy between Plaintiff and Defendant.  *Chloe*, 616 F.3d at 164.  Notably, Defendant has filed his own action, which is currently pending in the District of Arizona, seeking to hold Plaintiff liable for invasions of privacy and intentional infliction of emotional distress.  (Def. Br., Ex. 2; *see* Dkt. #69).  The facts underlying those claims overlap to a degree with the facts underlying Plaintiff's fourth claim for declaratory relief.  Thus, it would be inefficient for the parties to litigate the entirety of Defendant's case in Arizona, while simultaneously addressing only Plaintiff's fourth claim for declaratory relief in New York.  Rather, it would be more efficient for Plaintiff to adjudicate all the potential legal problems arising out of his relationship with Defendant in one forum.  *See Kernan* v. *Kurz-Hastings, Inc.*, 175 F.3d 236, 245 (2d Cir. 1999).  Consequently, this factor weighs against the exercise of personal jurisdiction.

26

### v.    Substantive Social Policies

The parties have not identified any substantive social policies that will be furthered by litigating this action in one forum rather than another.  Plaintiff submits an Arizona jury is more likely to be prejudiced against him.  (*See* Pl. Aff. 9 ("I … fear that an Arizona jury will assume that, if abuse occurred, I was the abuser because of my racial and ethnic background[.]")).  However, this Court will not countenance the suggestion that Plaintiff (or, indeed, either party) would receive anything other than fair process in a sister federal court. Thus, the "substantive social polic[y]" factor "does not favor either party in [the] assessment of the reasonableness criteria."  *Metro. Life Ins. Co.*, 84 F.3d at 575.

Taking all of the relevant factors into consideration, the Court concludes that exercising personal jurisdiction over Defendant would be unreasonable. Under the unique facts of this case, where: (i) the only contacts between Defendant and New York that could support jurisdiction are Defendant's brief interactions with NTVIC; (ii) no one affected by the relationship between Defendant and NTVIC wants to litigate any claim in New York; (iii) it is undisputed that the relationship between Defendant and NTVIC ended because of Plaintiff's conduct; and yet (iv) Plaintiff wants to hale Defendant back to New York to obtain a declaration that it was lawful to send the letter that severed Defendant's ties to the forum, despite the fact that (v) Plaintiff and Defendant are already engaged in litigation in Arizona, the exercise of personal jurisdiction "would violate our basic sense of fair play and substantial justice."  *Metro. Life Ins. Co.*, 84 F.3d at 575 (internal quotation marks omitted).

27

Because this Court cannot exercise personal jurisdiction over Plaintiff's four claims for declaratory relief, those four claims are dismissed.  *See* Fed. R. Civ. P. 12(b)(2).

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss under Rule 12(b)(6) and Rule 12(b)(2) is GRANTED.  Plaintiff's fifth cause of action is dismissed under Federal Rule of Civil Procedure 12(b)(6), and Plaintiff's remaining causes of action are dismissed under Federal Rule of Civil Procedure 12(b)(2).  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     March 14, 2016
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

28